Notice: This opinion is subject to formal revision before publication in the
Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify
the Clerk of any formal errors in order that corrections may be made
before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued  October  4,  2004        Decided  November  2,  2004

No. 03-5264

B. J. BUCHEIT,
APPELLEE/CROSS–APPELLANT

v.

THE PALESTINE LIBERATION ORGANIZATION AND
THE PALESTINIAN AUTHORITY,
APPELLANTS/CROSS–APPELLEES

Consolidated with
03-5293

Appeals from the United States District Court
for the District of Columbia
(No. 00cv01455)

*Maher Hanania* argued the cause and filed the briefs for
appellants/cross-appellees.

Bills of costs must be filed within 14 days after entry of judgment.
The court looks with disfavor upon motions to file bills of costs out
of time.

*Michael H. Selter* argued the cause and filed the briefs for appellee/cross-appellant.

Before: ROGERS, TATEL, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: This appeal arises from a conversion action brought by plaintiff Bernard J. Bucheit in the United States District Court for the District of Columbia. Bucheit alleges that the defendants, the Palestine Liberation Organization (PLO) and the Palestinian Authority (PA), converted property and money associated with a concrete plant that his company operated in Gaza. After a bench trial, the district court found the defendants liable for over $1.5 million, basing its valuation in part on offers to buy the converted property. At the same time, the court denied Bucheit's request for prejudgment interest. The defendants now appeal the court's valuation of the converted property, while the plaintiff cross-appeals the court's denial of prejudgment interest. We affirm the judgment of the district court.

I

Bucheit is the president of Bucheit International Limited (BIL), a construction firm with offices in the United States and Great Britain.[1] In 1994, BIL built and began to operate a precast concrete plant in Gaza. During the plant's first year of operation, BIL imported equipment and materials into Gaza via Haifa, Israel. The equipment included a Grove crane, two high trailers, a lowboy trailer, and a tractor truck. At the border, BIL filed customs declarations totaling $56,200 for these items. By contrast, in November 1995, BIL valued the same items at $542,590 for insurance purposes.

In 1994, Bucheit appointed a Gaza resident, Ghassan Abdel Aziz Abu Ramadan, as manager of the concrete plant. In January 1996, BIL dismissed Ramadan due to disagreements concerning his management and representation of BIL in

---

[1] The facts set forth in this Part are taken from the district court's findings of fact.

Gaza. Notwithstanding his dismissal, Ramadan continued to contract with the PA for BIL's services and the use of BIL's equipment. In August 1997, for example, the PA's Military Financial Administration leased BIL's Grove crane for use in Gaza Emergency Harbor, paying a total of $77,000 to Ramadan rather than to BIL.

BIL had obtained financing for the concrete plant from the Overseas Private Investment Corporation (OPIC), a U.S. government agency that provides loans and political risk insurance to U.S. companies for private investments abroad. BIL obtained a $1,100,000 loan from OPIC, which it secured with BIL's Gaza assets. In addition, Bucheit's three children, through the Bucheit Children's Trust, guaranteed the loan with real estate located in the District of Columbia.

In May 1997, after experiencing financial and other difficulties operating in Gaza, BIL defaulted on the OPIC loan. In order to repay OPIC, BIL began efforts to liquidate its Gaza assets. A company named Avi Cranes offered BIL $105,000 for the Grove crane and lowboy trailer, but BIL was unable to complete the sale because the PA's Military Financial Administration was using the crane in Gaza Emergency Harbor — pursuant to the lease with Ramadan. Another company, Gulf Global, submitted a bid of $1,630,000 for all of BIL's assets in Gaza, but that sale could not be completed, both because the crane was still being used at the harbor, and because the defendants would not provide the necessary documentation for the plant and other assets. Later, Gulf Global made another bid of $106,000 for the crane alone, but that sale fell through as well: the crane needed repairs after its detour to the harbor project.

Finally, in the fall of 1999, a non-profit corporation called Builders for Humanities (BFH) submitted a letter of intent to purchase BIL's plant and machinery for $1,600,000. BIL accepted the letter of intent. But that deal failed as well, again because BIL could not obtain the necessary authorizing documentation from the defendants.

Because BIL was unable to liquidate its Gaza assets, the Bucheit Children's Trust had to satisfy its guarantee of the

OPIC loan by selling its District of Columbia real estate. The Trust did so in December 1999, and wired the proceeds to OPIC. OPIC declared the loan paid in full and assigned all rights arising out of the interference with its secured collateral to the Trust, which, in turn, assigned its rights to Bucheit.

In June 2000, Bucheit sued the PA and the PLO in the United States District Court for the District of Columbia. Bucheit alleged that he had succeeded to all of OPIC's interest in the secured assets by virtue of the assignments, and charged that the defendants had wrongfully converted OPIC's money and property by interfering with its lien on the Gaza assets. The district court concluded that it had jurisdiction over the matter under the commercial activity exception to the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1605(a)(2). It further concluded that Bucheit was an "equitable subrogee" of OPIC's rights under the BIL loan, and that he was entitled "to those remedies and damages" — but only those remedies and damages — "that OPIC could have asserted." *Bucheit v. Palestine Liberation Organization*, No. 00-1455, Findings of Fact and Conclusions of Law at 14 (D.D.C. Aug. 18, 2003). Pursuant to the parties' stipulation that District of Columbia law would apply unless it differed from "the relevant Palestinian commercial law," and finding that the defendants had not identified any applicable portions of the latter, the court relied on District of Columbia law without objection by the parties. *Id.* at 12-13.

The district court conducted a two-day trial to determine whether the defendants were liable for conversion for interfering with OPIC's rights to BIL's assets, and, if so, the amount of damages OPIC suffered as a consequence of such conversion. With respect to liability, the court concluded that the defendants had indeed converted OPIC's property. Noting that conversion is "any unlawful exercise of ownership, dominion or control over the personal property of another in denial or repudiation of his rights thereto," *id.* at 14 (quoting *Duggan v. Keto*, 554 A.2d 1126, 1137 (D.C. 1989)), the court found that the defendants were "liable for conversion of any funds paid [to Ramadan] under contracts for use of BIL

assets and for impeding liquidation sales" of those assets. *Id.* at 18.

In calculating the amount of damages, the district court "rel[ied] primarily on documentary evidence of valuation and on the amounts BIL was prepared to accept for the attempted sales of these assets." *Id.* at 19. The court found that the total value of the converted assets was $1,782,000 — $77,000 in lease payments to Ramadan, $105,000 for the crane and lowboy (the amount of Avi Cranes's accepted offer), and $1,600,000 for the plant and machinery (the amount of BFH's accepted offer). The court declined to rely on either of Gulf Global's offers, noting that there were "problems" with the proposed $106,000 sale of the crane, and that the $1,630,000 bid for the plant and other assets lacked documentary support. *Id*. at 20.

Finally, because Bucheit brought the conversion action as the "subrogee of OPIC's rights," the court held that Bucheit was "entitled only to those remedies and damages that OPIC could have asserted." *Id.* at 21. It thus reduced Bucheit's recovery from $1,782,000 to $1,531,053.34, the amount that OPIC had accepted in satisfaction of BIL's debt (including interest and fees).[2]

Although the court awarded Bucheit damages for conversion, it denied his request for prejudgment interest. The court noted that "under District of Columbia law, courts have a 'wide range of discretion' to determine whether prejudgment interest should be awarded," *id.* at 22 (quoting *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 550 n.6 (D.C. 1981)), and that in a conversion action, "pre-judgment interest may be included as part of the damages . . . to the extent that it will make the injured party whole." *Id.* (quoting *Duggan*, 554

---

[2] The district court appears to have included in its valuation of BIL's Gaza assets approximately $180,000 worth of equipment that BIL leased but did not own. Although the parties dispute the impact this had on the validity of the valuation, the defendants concede that, even if the court's $1,782,000 valuation were reduced by that amount, the adjusted total would still exceed the amount at which the court capped Bucheit's recovery — and hence would not affect the size of the plaintiff's award.

A.2d at 1140). The court read D.C. law as providing that "plaintiffs bear the burden of proof that prejudgment interest is necessary to compensate them fully," and concluded that Bucheit had failed to carry that burden. *Id.* Pursuant to Federal Rule of Civil Procedure 59(e), Bucheit filed a motion for reconsideration of the denial of prejudgment interest, which the court denied.

On this appeal, the defendants do not challenge the court's determination that they converted the plaintiff's Gaza assets. They do, however, appeal the court's calculation of damages. Bucheit cross-appeals from the denial of prejudgment interest. We consider these two appeals in Parts II and III, respectively.

## II

The "traditional standard for calculating damages for conversion is the fair market value of the property at the time of the conversion." *Bowler v. Joyner*, 562 A.2d 1210, 1213 (D.C. 1989) (quoting *Duggan*, 554 A.2d at 1137). "Fair market value," in turn, "is generally defined as that price at which a willing seller and a willing buyer will trade." *Williams v. United States*, 376 A.2d 442, 444 (D.C. 1977); *see Reservation Eleven Assocs. v. District of Columbia*, 420 F.2d 153, 155 (D.C. Cir. 1969). Under District of Columbia law, " '[a]n injured party will not be precluded from recovering damages because he cannot prove his exact damages' so long as there is a reasonable basis for approximation." *Bowler*, 562 A.2d at 1214 (quoting *R.S. Willard Co. v. Columbia Van Lines Moving & Storage Co.*, 253 A.2d 454, 456 (D.C. 1969)). This court regards damage awards as "findings of fact" governed by Federal Rule of Civil Procedure 52(a), "which will not be disturbed unless clearly erroneous." *Eureka Inv. Corp. v. Chicago Title Ins. Co.*, 743 F.2d 932, 940 (D.C. Cir. 1984); *see Safer v. Perper*, 569 F.2d 87, 100 (D.C. Cir. 1977); *see also Bowler*, 562 A.2d at 1213–14 (D.C. 1989).

In this case, the district court relied upon accepted offers to purchase property (by Avi Cranes and BFH) as the measure of the property's fair market value. As a theoretical matter,

it would be difficult to conclude that such offers represent a clearly erroneous basis for valuing the "price at which a willing seller and willing buyer" will trade, as that is exactly what such accepted offers profess to be.[3] While the defendants suggest that the $56,200 BIL listed on its customs declaration was a better measure of valuation for the crane and lowboy than the $105,000 offered by Avi Cranes, the court did not clearly err in accepting the plaintiff's testimony that "BIL purposely used low declaration values upon advice of those familiar with Israeli and Palestinian customs practices." *Bucheit* at 3. That is particularly so in light of BIL's subsequent valuation of the same equipment at $542,590 for insurance purposes.

The defendants also challenge the court's decision to rely on BFH's $1,600,000 offer for the concrete plant. That challenge is based on the trial testimony of Leonard Loch, who represented BFH in its bid. Loch testified that BFH was not actually committed to purchasing the plant, and that Bucheit had misrepresented its value. But the district court discredited Loch's testimony, noting that the defendants' failure to include Loch on their witness list had deprived the plaintiff of the opportunity to depose him, and that Loch had sat in the courtroom listening to the testimony of the other witnesses prior to taking the stand himself. Trial Tr. at 43-44; *cf.* FED. R. EVID. 615 (authorizing the exclusion of wit-

---

[3] *See Basiliko v. Pargo Corp.*, 532 A.2d 1346, 1350 (D.C. 1987) (holding that, to determine fair market value, "the trial court may consider as evidence the price at which [appellant] had agreed to sell the property"); *cf. Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 741-42 (1997) (noting that "the very best evidence of the value" of particular items "might be their actual selling price (assuming, of course, that the sale were made in good faith and at arm's length)"); *Schonfeld v. Hilliard*, 218 F.3d 164, 178 (2d Cir. 2000) ("If, fortunately, the asset [to be valued] has a sales history, then despite the lack of a traditional market, it is easier for the court to determine the asset's market value as of the time it was lost. Indeed, it is well-established that a recent sale price for the subject asset, negotiated by parties at arm's length, is the 'best evidence' of its market value." (quoting *Suitum*, 520 U.S. at 742)).

nesses "so that they cannot hear the testimony of other witnesses"). The court further concluded that Loch's testimony was inconsistent with the documentary evidence, including Loch's October 13, 1999 letter of intent to purchase the assets. *Bucheit* at 21 n.9. That letter did not qualify BFH's commitment in any way, stating instead that:

> LML [Leonard M. Loch] ... shall purchase the equipment through a non-profit entity ... called Builders for Humanities ("BFH").... The purchase price of the equipment from BFH to Bucheit ... shall be determined in coordination with OPIC and outside consultant, but in no event shall it be less than $1,600,000.

Pl.'s Ex. 71. The district court, which was in the best position to evaluate the credibility of the witnesses and to compare their testimony to the documentary evidence, did not clearly err in relying on the latter.

## III

Bucheit's complaint included a request for prejudgment interest on the amount of any damages awarded for conversion. Although the district court found that the defendants had converted the plaintiff's property, and that the plaintiff was entitled to damages for that conversion, it denied the request for prejudgment interest. We review that denial for abuse of discretion. *See Frederick County Fruit Growers Ass'n, Inc. v. Martin*, 968 F.2d 1265, 1275 (D.C. Cir. 1991).

The district court read an opinion of the District of Columbia Court of Appeals, *Duggan v. Keto*, 554 A.2d 1126, 1140 (D.C. 1989), as holding that a court may include prejudgment interest as part of the damages in a conversion case only to the extent that such interest is required to make the injured party whole, and declared that the plaintiff bears the burden of proving the latter. *See Bucheit* at 22. Because Bucheit had offered no evidence to prove that prejudgment interest was necessary to compensate him fully, the court concluded that interest was unwarranted. That conclusion was not an abuse of discretion. Indeed, the court was generous in its description of Bucheit's litigation efforts: over two days of

trial, Bucheit not only failed to offer any evidence regarding the need for prejudgment interest, he failed to mention the subject at all.

On appeal, Bucheit argues that the district court employed the wrong legal standard in ruling on the interest issue. In support, he insists that the D.C. Court of Appeals' decision in *Federal Marketing Co. v. Virginia Impression Products Co.*, 823 A.2d 513 (D.C. 2003), supercedes *Duggan*. Under *Federal Marketing*, he contends, the award of prejudgment interest is presumptively warranted, unless there is an affirmative reason that counsels against it.

Bucheit's theory that *Federal Marketing* marks a new path in the District of Columbia's treatment of prejudgment interest could be correct. While acknowledging that "the 'general rule' may be that prejudgment interest is usually unavailable in breach of contract cases involving unliquidated claims," the D.C. Court of Appeals stated:

> [T]he court has ample discretion to include prejudgment interest as an element in the damages awarded, if necessary to fully compensate the plaintiff. The court usually should award such 'delay damages' . . . absent some justification for withholding such an award.

*Federal Marketing*, 823 A.2d at 532 (internal quotation marks and citations omitted). This could suggest that courts should award prejudgment interest more frequently, and that it is the defendant's burden to establish a justification for withholding such an award.

We need not conclusively divine the meaning of *Federal Marketing*, however, because even if the plaintiff's theory is correct, he never drew that case to the attention of the trial court. Although the D.C. Court of Appeals did not issue *Federal Marketing* until after the parties completed their briefing in the district court, five months passed between the issuance of *Federal Marketing* and the release of the district court's decision. Bucheit did not take advantage of that opportunity to advise the court of the decision — much less to advance his theory that *Federal Marketing* supercedes *Dug-*

*gan* for prejudgment interest in conversion cases — by filing a supplemental brief. Moreover, although Bucheit filed a motion to reconsider the denial of prejudgment interest on August 25, 2003, more than three months after *Federal Marketing* was issued, that motion likewise failed to mention his new theory of entitlement to prejudgment interest under *Federal Marketing*.

In short, Bucheit never advised the district court of his theory — which he presents for the first time on appeal — that *Federal Marketing* changed the course of District of Columbia law regarding prejudgment interest. As we have previously held, "while a court *may* draw upon its own knowledge of applicable precedents . . ., it is not *required* to unearth theories and precedents not cited by a party. . . . Bringing those precedents and theories to the attention of the district judge is the job of the party's attorneys." *Ned Chartering & Trading, Inc. v. Republic of Pakistan*, 294 F.3d 148, 155 (D.C. Cir. 2002). In any event, given the district court's view that both parties' "evidence of valuation" was "weak," *Bucheit* at 19, it was hardly unreasonable for the court to conclude that the damages award was sufficient to fully compensate Bucheit. *See Federal Marketing*, 823 A.2d at 532 (affirming the denial of prejudgment interest because the "court reasonably could view an award without such interest as sufficient to compensate" the plaintiff).

## IV

We conclude that the district court did not clearly err in calculating the value of the property converted by the defendants, and that the court did not abuse its discretion in denying the plaintiff's request for prejudgment interest.[4] Its decision is therefore

*Affirmed.*

---

[4] The district court's ruling on Bucheit's Rule 59(e) motion to reconsider is also reviewable only for abuse of discretion, *Ciralsky v. CIA*, 355 F.3d 661, 668 (D.C. Cir. 2004), and we find no such abuse here.