# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 14, 2005        Decided May 27, 2005

Nos. 04-7044 & 04-7067

THE GOVERNMENT OF RWANDA,
APPELLEE/CROSS-APPELLANT

v.

ROBERT WINTHROP JOHNSON II,
APPELLANT/CROSS-APPELLEE

———

Appeals from the United States District Court
(USDC) for the District of Columbia
(No. 97cv01550)

———

*James R. Atwood* argued the cause for appellant/cross-appellee Robert Winthrop Johnson II. With him on the briefs was *Heidi C. Doerhoff*.

*David J. Farber* argued the cause and filed the briefs for appellee/cross-appellant The Government of Rwanda.

Before: EDWARDS, TATEL, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: As Rwanda's bloody civil war drew to a close, with rebel forces controlling Rwanda's capital and the

retreating government accused of genocide, the embattled regime retained appellant, a Washington lawyer, to help improve its image and cast the rebels as terrorists. Roughly a week later, after the United States ordered Rwanda's embassy closed, appellant entered a second agreement, this time to provide (among other things) immigration help to Rwanda's ambassador and other embassy diplomats, who feared reprisals if they returned home. Pursuant to these agreements, Rwanda paid some $80,000 into appellant's client trust account, and after the war a new government formed by the victorious rebels sued to get the money back. Following a bench trial, the district court found appellant liable for conversion and breach of fiduciary duty, explaining that appellant had performed virtually no work under the first contract and treated the second as a personal account with Rwanda's former ambassador rather than an agreement with Rwanda itself. The court also awarded $10,000 in punitive damages. For the most part, we affirm.

## I.

Some of the late twentieth century's most horrific events form the background of this litigation. On April 6, 1994, a surface-to-air missile from an as-yet unidentified source shot down an aircraft carrying Rwanda's president, Juvenal Habyarimana. Stepping into the power vacuum, extremists from Rwanda's majority Hutu ethnic group formed an interim government and unleashed genocidal violence that over the next 100 days claimed the lives of some 800,000 Rwandans, most of them ethnic Tutsis, a minority group historically dominant in Rwandan politics. As ill-equipped United Nations peacekeepers stood by, powerless to contain the bloodshed, a Tutsi rebel force called the Rwandan Patriotic Front ("RPF") canceled a 1993 ceasefire and resumed its offensive against the government.

While civil war and genocide raged, Rwanda's embassy in Washington entered into the two agreements at issue in this

case. First, on July 8, 1994, four days after RPF forces captured Rwanda's capital Kigali, Rwanda's United States Ambassador Aloys Uwimana, a representative of the Hutu government, signed a "Memorandum of Understanding" with three Americans—appellant Robert W. Johnson II; Timothy Towell, a retired U.S. diplomat; and Edward van Kloberg III, a Washington lobbyist. Under this agreement, the three Americans, termed the "Rwanda Working Group" or "RWG," were to "assist the Government of Rwanda, through Ambassador Aloys Uwimana in Washington, to get its views clearly and dramatically presented to the international community." In particular, the RWG would "[e]ncourage the comprehension and support of American authorities of Rwanda's cause," aiming to "isolat[e]" the RPF and foster the perception that it constituted "a marginal group, perhaps even a minority, foreign-manipulated, terrorist group." The MOU, which called for payments totaling $70,000, required an initial deposit of $28,000. On July 13, Rwanda's embassy cut a check for that amount to the "Robert W. Johnson II Trust Fund."

But it was soon too late for lobbying. On July 15—just one week after Rwanda signed the MOU and two days after Rwanda's $28,000 payment—the United States issued a "Note Verbale" requiring, given "the uncertain and untenable situation which has existed in Rwanda since April 6, 1994," that the embassy terminate all "operations of the diplomatic mission, other than activities relating to the closure of the mission, effective July 22, 1994." Though one embassy official, Boniface Karani, was "permitted to remain in the United States for the present to oversee the closing of the Embassy," the note ordered Ambassador Uwimana to leave the country "no later than July 22, 1994." "All remaining members of the mission and their family members (other than any who may be citizens or legal permanent residents of the United States), including Mrs. Uwimana and children," were to "depart the United States no later than August 14, 1994."

The Note Verbale precipitated Johnson's second agreement with Rwanda. In a letter to Ambassador Uwimana, Johnson offered to help with the embassy's closure, providing in particular "continued oversight and assistance" regarding immigration requests by embassy employees hoping to remain in the United States instead of returning to the chaos in Rwanda. Johnson proposed:

> [W]e will work with the State Department to ensure that their recommendations to the Immigration and Naturalization Service are favorable, and we will obtain testimony from experts that conditions in Rwanda are presently life-threatening. Also, we shall supervise and coordinate the activities of [two immigration attorneys] in the preparation of the asylum requests and the handling of the cases to ensure that the work is thorough and cost-effective.

Claiming that "[a]ll the $28,000.00 [paid under the MOU] has been disbursed or obligated," Johnson's letter requested $55,000 for the new work—$30,000 for the immigration attorneys and $25,000 for the RWG. On July 22, the day the embassy closed, Ambassador Uwimana signed Johnson's proposal and authorized a check for $55,000, again payable to Johnson's client trust fund.

The following month, Johnson learned that the United States had recognized the RPF as Rwanda's legitimate government. Soon afterwards, Karani, by then newly reappointed to the embassy, wrote "to confirm the termination" of the July 22 agreement and demand return of $17,475, the amount Karani calculated to be left in the account. Apparently referring to immigration work performed on Uwimana's behalf, Karani observed that "necessary steps have been taken for only one diplomat family," making Johnson's retention of the full $55,000 unnecessary. Nonetheless, Johnson refused to make any refund, insisting in two response letters that only Uwimana

could direct his expenditures. Two months later, another embassy official demanded return of the entire $55,000. Again, Johnson refused.

Having thus failed to obtain a voluntary refund, Rwanda sued in the U.S. District Court for the District of Columbia, asserting D.C. law claims of conversion and breach of fiduciary duty against Johnson, Uwimana, and Johnson's two RWG colleagues. Uwimana declared bankruptcy, obtaining an automatic stay under 11 U.S.C. § 362, and Johnson's two partners settled, paying Rwanda $26,200 out of the $28,000 paid under the MOU. After denying Johnson's motion to dismiss and Rwanda's motion for summary judgment, *see Gov't of Rwanda v. Rwanda Working Group*, 150 F. Supp. 2d 1 (D.D.C. 2001), the district court held a two-day bench trial. Based on extensive factual findings, the district court concluded that "none of the lobbying or other work for Rwanda ever took place under the July 8 MOU" and that Johnson "used $55,000 from the July 22 Letter Agreement almost exclusively for Mr. Uwimana's asylum request and for other immigration services," undertakings the district judge believed were "against the interest of [Johnson's] client, the Government of Rwanda." *See Gov't of Rwanda v. Rwanda Working Group*, 227 F. Supp. 2d 45, 63 (D.D.C. 2002) ("*RWG*").

The district court held Johnson liable for conversion and fiduciary breach as to both the MOU and the July 22 agreement, imposing liability in the amount of $56,800—$1,800 as the balance from the MOU payment following the two RWG members' settlement, plus $55,000 based on the July 22 agreement. *Id.* at 72-73. In addition, finding that Johnson's "actions in this case were accompanied by gross recklessness and a willful disregard of the rights of his rightful client—the Government of Rwanda," the district court imposed $10,000 in punitive damages. *Id.* at 72. Finally, the court referred claims

for prejudgment interest and attorney's fees to a magistrate judge, *id.* at 73, who awarded interest but not fees.

Johnson now appeals the district court's judgment in Rwanda's favor on the conversion and fiduciary breach counts as well as its award of punitive damages. Rwanda cross-appeals the denial of fees and calculation of prejudgment interest.

## II.

We begin with Johnson's challenges to the conversion and fiduciary breach claims, reviewing the district court's factual findings for clear error and its legal conclusions de novo, *see, e.g.*, *Singletary v. District of Columbia*, 351 F.3d 519, 523 (D.C. Cir. 2003); *see also* Fed. R. Civ. P. 52(a) (indicating that following trial without a jury, "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses"). In addition to disputing the legal sufficiency of the district court's findings, Johnson argues that notwithstanding Rwanda's later demand for the full $55,000, Karani's earlier letter ratified all but $17,475 of his expenditures pursuant to the July 22 agreement—a proposition Johnson says is conclusively established by *In re Uwimana*, 274 F.3d 806 (4th Cir. 2001), a Fourth Circuit case involving former Ambassador Uwimana's personal bankruptcy. Because we agree with the district court that Johnson breached his fiduciary duties with respect to both agreements, we will affirm the district court's judgment without considering the conversion claims. But because we agree with Johnson that the Fourth Circuit's decision has preclusive effect, we will reduce the amount of Rwanda's recovery.

### *The MOU*

Starting with the $1,800 left over from Rwanda's MOU payment, we have little trouble upholding Johnson's liability.

Though the record indicates that Johnson disbursed Rwanda's entire $28,000 payment, himself pocketing a $3,000 fee plus $41 in expenses, the district court found that neither he nor anyone else performed any of the lobbying services called for in the MOU, *see RWG*, 227 F. Supp. 2d at 54. Indeed, according to district court findings unchallenged by Johnson, "the only work Mr. Johnson performed pursuant to the July 8 MOU was to administer the contract, disburse the $28,000, and make sure that the checks disbursing the $28,000 would not bounce." *Id.* at 55. Yet Johnson told his client otherwise, stating in the proposal that became the July 22 agreement that "[a]ll of the $28,000 has been disbursed or obligated for work performed thus far on various projects" and that Johnson's two colleagues had "maintained continuous liaison with State Department officials to provide accurate information and to persuade the State Department to modify the White House's hard line with respect to the closure of the embassy and the expulsion of the diplomatic staff"—assertions the district court found to be "blatant misrepresentations," *id.*

As Rwanda's agent under the MOU and as trustee of Rwanda's $28,000, Johnson owed a fiduciary duty to "deal in the principal's interest" and put Rwanda's interests before his own. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 901 F.2d 1124, 1128 (D.C. Cir. 1990); *see also Maxwell v. Gallagher*, 709 A.2d 100, 102 & n.4 (D.C. 1998) (affirming liability for fiduciary breach where the lower court found in a bench trial that defendants "placed their private interest . . . above the interest of the . . . client"); *Aronoff v. Lenkin Co.*, 618 A.2d 669, 687 (D.C. 1992) (noting that agents "owe[] a duty of good faith and candor" to their principal). Johnson's deception of the Rwandan embassy regarding the RWG's work breached that obligation. So did Johnson's disbursal of the entire $28,000—including over $3,000 for himself—despite the RWG's failure to perform its side of the contract. We thus find

no error in the $1,800 award, barely half the amount Johnson pocketed and far less than he disbursed.

*The July 22 Agreement*

We also agree with the district court that Johnson breached his fiduciary obligations with respect to the July 22 agreement, though we depart somewhat from its reasoning. Relying on what it called "the common-sense notion that it is not in a government's interest to have one of its ambassadors choose to seek asylum in another country, whatever the merits of the asylum request might be," the district court held that Johnson's immigration assistance to embassy staff necessarily conflicted with the interests of the state of Rwanda, Johnson's client under his two agreements with Rwanda's embassy. *See RWG*, 227 F. Supp. 2d at 63, 64-65. Insofar as the district court expressed a categorical view about ambassadorial authority, we hesitate to endorse its reasoning, for we think that in some circumstances it may serve a war-torn state's interests to allow key embassy personnel to remain safely in the United States if their lives would be threatened back home. Moreover, while the Note Verbale's one-week closure deadline certainly "underscored that [the United States] would no longer recognize Mr. Uwimana as Ambassador after July 22, 1994," *id.* at 68, it also required quick decisions regarding use of the embassy's soon-to-be-inaccessible funds. In this context, a reasonable attorney may well have believed that Uwimana, even on his last day in office, could expend state money to protect embassy staff.

The problem for Johnson is that Uwimana did more than just protect his staff—he also spent Rwanda's money on himself. Whatever the scope of an ambassador's authority to order immigration services in general, such self-dealing breached a critical obligation that Uwimana owed to Rwanda as steward of its United States embassy, namely, "the age-old principle applicable to fiduciary relationships that, unless there

is a full disclosure by the agent, trustee, or attorney of his activity and interest in the transaction to the party he represents and the obtaining of the consent of the party represented, the party serving in the fiduciary capacity cannot receive any profit or emolument from the transaction." *McGinnis v. Rogers*, 279 A.2d 459, 470 (Md. 1971); *cf. Urban Invs., Inc. v. Branham*, 464 A.2d 93, 96 (D.C. 1983) (per curiam) (holding that agents must obtain "full[] and free[]" consent to any dual representation). Indeed, citing this rule, the Fourth Circuit concluded in Uwimana's bankruptcy case that Uwimana owed Rwanda a non-dischargeable debt for "defalcation," i.e., "failure to meet an obligation," because he "used at least some of the funds belonging to the Republic of Rwanda to purchase a substantial benefit—preparation of a case for asylum—for himself and his family, without disclosing his act to the government of the state he represented or seeking its consent." *See Uwimana*, 274 F.3d at 811, 812 (internal quotation marks omitted).

Given Uwimana's conflict of interest, Johnson, an attorney presumably familiar with agency principles, should have not only questioned Uwimana's authority, but also demanded evidence that Rwanda consented to its ambassador's apparent looting of state coffers. To be sure, the chaos in Rwanda, coupled with the Note Verbale's short time-frame, may have limited Johnson's ability to verify Uwimana's authority. But Johnson could have at least made some effort. Instead, according to district court findings—again, unchallenged here—Johnson "never took any steps to determine the extent of Mr. Uwimana's authority." *RWG*, 227 F. Supp. 2d at 68. It thus makes no difference whether, as the parties debate, Johnson's client at the time was merely the interim government or the Rwandan state as a whole (soon to be controlled by the RPF), for Johnson sought clarification from neither. Indeed, Johnson even failed to ask the State Department which government the United States recognized. *See id.* at 58.

The same problem carries through to Johnson's implementation of the July 22 contract. In addition to immigration services, the agreement did call for "continued support to Embassy personnel on governmental and personal matters during the transition" as well as help managing embassy bank accounts. But with respect to "services supposedly involved in closing down the Embassy," the district court found that Johnson "spent less than half an hour" on certain administrative tasks and "never completed or submitted a list of Embassy debts to the Department of State, or took care of Embassy vehicles, insurance policies, addresses, or leases, among other things," *id.* at 57, apparently because the State Department told him such measures were unnecessary. What Johnson did do was expend large sums on Uwimana's immigration requests—precisely the problematic aspect of the July 22 agreement. Indeed, Johnson refused to change course even when Rwanda's new government, which by then Johnson knew the United States recognized, demanded return of $17,475.

In short, although Johnson should have been circumspect from the start about Uwimana's authority, he instead took the view, convenient for his own interest, that Uwimana could use state money to buy himself tens of thousands of dollars in immigration services. Johnson insisted, moreover, that Uwimana retained that authority long after Uwimana ceased to hold any official position—indeed, long after the government Uwimana represented had ceased to control Rwanda. Thus complicit in Uwimana's self-dealing, Johnson again breached his duty to "deal in the principal's interest." *Merrill Lynch*, 901 F.2d at 1128.

How much, then, does Johnson owe? Were the full $55,000 in play, we might need to decide whether Johnson's breach covered that entire sum or only a portion of it. But we think the Fourth Circuit's decision in former Ambassador Uwimana's personal bankruptcy case limits Rwanda to a far smaller amount.

The Fourth Circuit held that by demanding only $17,475 in Karani's letter, Rwanda ratified expenditures beyond that amount and thus could recover no greater sum in its defalcation action. *See Uwimana*, 274 F.3d at 813. The doctrine of issue preclusion bars parties from relitigating any issue "contested by the parties and submitted for judicial determination in [a] prior case," so long as "the issue [was] actually and necessarily determined by a court of competent jurisdiction in that prior case" and "preclusion in the second case [would] not work a basic unfairness to the party bound by the first determination." *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992). Here, the district court, reasoning that the Fourth Circuit's decision involved a different claim (defalcation rather than fiduciary breach or conversion) and a different defendant (Uwimana rather than Johnson), denied preclusive effect to the prior judgment against Rwanda. *See RWG*, 227 F. Supp. 2d at 68-69. We disagree.

As the Supreme Court made clear in *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313 (1971), issue preclusion does not require mutuality of parties. "In any lawsuit," the Court explained, "where a defendant, because of the mutuality principle, is forced to present a complete defense on the merits to a claim which the plaintiff has fully litigated and lost in a prior action, there is an arguable misallocation of resources." *Id.* at 329. According to Johnson, any reconsideration of the effect of Karani's letter would entail just such a misallocation. In other words, he argues that because Rwanda already litigated ratification and lost, it shouldn't get to do so again. Responding, Rwanda asserts that this case involves no second bite at the apple because the theory in *In re Uwimana* (the ambassador's defalcation) differs from the claim here (Johnson's fiduciary breach). The defect in this analysis is that the Fourth Circuit's ratification holding, while directly addressing only Uwimana's liability, depended on a refund request *written to Johnson*. *See Uwimana*, 274 F.3d at

813.  Had Rwanda demanded the funds directly from Uwimana, its argument might have some force, for in that case Rwanda could have intended to forgive Uwimana's payment but not necessarily Johnson's use of the money.  But Karani's letter to Johnson never even mentions Uwimana by name.  It deals entirely with Johnson's expenditures, removing from the refund tally "steps . . . taken for . . . one diplomat family," i.e., Uwimana's.  To find ratification as to Uwimana, then, the Fourth Circuit must also have found ratification as to Johnson.  Any other result would attribute to Rwanda an entirely illogical intention, i.e., approving Uwimana's authorization of the steps in question but not Johnson's performance of those very same steps, even though Karani's letter refers only to Johnson's performance.

The Fourth Circuit thus "actually and necessarily determined" Rwanda's ratification of Johnson's expenditures.  *See Yamaha*, 961 F.2d at 254.  In addition, we see no "basic unfairness" in precluding relitigation, *see id.*, for the prior proceedings gave Rwanda every incentive to dispute the letter's significance vis-à-vis Johnson's possession and use of state funds.  Indeed, because Uwimana's ratification theory depended on Karani's letter, Rwanda could have prevailed in the Fourth Circuit only by contesting Johnson's liability.  Where, as here, "there is no prejudice to the plaintiff, no forfeiture of the res judicata issue has yet occurred, the relevant facts stand uncontroverted in the record before us, and denial would only engender delay," we ourselves may resolve a preclusion claim without remanding to the district court.  *See Baker v. District of Columbia*, 326 F.3d 1302, 1308 (D.C. Cir. 2003) (internal quotation marks and brackets omitted).  Accordingly, though we will affirm the district court's finding of fiduciary breach, we will reverse its preclusion holding and limit Johnson's liability on this count to a maximum of $17,475.

With Johnson's exposure thus restricted, the amount of Rwanda's damages becomes obvious. In disbursing the $55,000, Johnson paid $24,500 to Van Kloberg (the RWG lobbyist) and Van Kloberg's lobbying firm. *See RWG*, 227 F. Supp. 2d at 56. As to the July 22 agreement, the district court found that any work Van Kloberg or his organization performed "would have been of a private nature and for Mr. Uwimana's personal benefit, rather than work for the Government of Rwanda." *Id.* at 57. Clear, unchallenged findings thus establish that Johnson expended at least $24,500 on personal services for Uwimana. Because Johnson's fiduciary breach—assisting Uwimana without proper authorization—caused all these expenditures, totaling well over Rwanda's maximum recovery, we will direct entry of judgment for $17,475 based on the July 22 counts.

## III.

The remaining issues—attorney's fees, punitive damages, and prejudgment interest—need not long detain us. Because Rwanda failed first to appeal the magistrate's denial of attorney's fees to the district judge, it has forfeited its right to appeal that issue here. Though it is true, as Rwanda points out, that the applicable referral order cited a local rule that says nothing about objecting in the district court, local rules must be "consistent with" the federal rules, Fed. R. Civ. P. 83(a)(1), and the Federal Rule of Civil Procedure on magistrate referrals makes plain that objections to magistrate rulings are forfeited absent timely challenge in the district court, *see* Fed. R. Civ. P. 72; *see also CNPq—Conselho Nacional de Desenvolvimento Cientificio e Technologico v. Inter-Trade, Inc.*, 50 F.3d 56, 59 (D.C. Cir. 1995) (per curiam).

As to punitive damages, "[i]n a case tried without a jury, whether an award of punitive damages is warranted is a matter committed to the discretion of the trial court." *Wash. Med. Ctr.,*

*Inc. v. Holle*, 573 A.2d 1269, 1284 (D.C. 1990). Given the serious fiduciary breaches discussed above, the district court's decision to award punitive damages could hardly have constituted an abuse of discretion. Nevertheless, and without suggesting that $10,000 is necessarily inappropriate, we will remand the amount of the award for reconsideration in light of our reduction of Johnson's underlying liability from $56,800 to $19,275 ($1,800 plus $17,475).

Finally, the magistrate judge, believing that a District of Columbia statute constrained his choice of interest rate, awarded Rwanda prejudgment interest at six percent per year. Yet the law in question merely sets the default interest rate "upon the loan or forbearance of money, goods, or things in action in the absence of an expressed contract." *See* D.C. Code Ann. § 28-3302(a). As the D.C. Court of Appeals has held, this provision has no bearing on prejudgment interest in actions, like Rwanda's tort claims against Johnson, that involve neither loans nor forbearances. *See In re Estate of Jung*, 801 A.2d 59, 60 (D.C. 2002) (addressing claims against an estate and finding section 28-3302(a) inapplicable because the claimant's "share of his mother's estate was not a loan from him to the Estate[,] [n]or did his waiting to receive that share constitute a forbearance on [his] part"); *cf. Duggan v. Keto*, 554 A.2d 1126, 1140-41 (D.C. 1989) (allowing award of prejudgment interest in a tort action "to the extent that it will make the injured party whole" but remanding the question whether section 28-3302(a) governed the interest rate). Accordingly, we will remand the award so that the district court can select an interest rate without regard to the D.C. statute.

We will also remand the principal amount, though not for the reason Rwanda suggests. Whereas Rwanda argues that Johnson must pay interest on portions of the MOU payment covered by the other defendants' settlement, we review denial of prejudgment interest only for abuse of discretion, *see Bucheit*

*v*. *Palestine Liberation Org.*, 388 F.3d 346, 351 (D.C. Cir. 2005), and the district court can hardly have abused its discretion by ordering Johnson to pay interest only on amounts he himself owes. But because our reduction of Johnson's primary liability may require recalculation of the interest award, we will nonetheless remand this issue as well.

## IV.

In sum, although we affirm the judgment against Johnson for breach of fiduciary duty as to both the MOU and the July 22 agreement, we limit Rwanda's recovery under the latter to $17,475, resulting in a total award of $19,275. We also affirm the award of punitive damages, but remand for reconsideration of the amount. With respect to Rwanda's cross-appeal, we deem forfeited the appeal of attorney's fees and remand the award of prejudgment interest for recalculation consistent with this opinion.

*So ordered.*