In re Robert W. JOHNSON,
II, Respondent.

A Member of the Bar of the District of
Columbia Court of Appeals (Bar
Registration No. 945170).

No. 09–BG–320.

District of Columbia Court of Appeals.

Decided Nov. 25, 2009.

Before FISHER and OBERLY, Associate Judges, and NEBEKER, Senior Judge.

PER CURIAM:

Seven years ago, Bar Counsel received and reviewed the findings of the United States District Court in *Gov't of Rwanda v. Rwanda Working Group*, 227 F.Supp.2d 45 (D.D.C.2002). As a result, Bar Counsel opened an investigation into the ethical conduct of respondent, Robert W. Johnson, II, a member of the bar of this court who represented the government of Rwanda at the beginning of a tragic period of bloody upheaval in that nation.

Following the assassination of its president in April 1994, Rwanda was torn by civil war. Ethnic tensions between the Hutu and Tutsi populations escalated and Hutu extremists massacred hundreds of thousands of people, most of whom were Tutsi. In July 1994 the Rwandan Patriotic Front ("RPF"), comprised largely of Tutsi, launched a military offensive that halted the killings and replaced the predecessor Hutu government. This led, however, to a massive exodus from Rwanda of Hutu civilians fearing Tutsi retaliation.

Before the RPF offensive, Aloys Uwimana was the Rwandan ambassador to the United States, and on July 8, 1994, he signed a Memorandum of Understanding with the Rwandan Working Group ("RWG"), a lobbying organization that consisted of respondent and two other individuals. Under the terms of this memo, RWG was paid $28,000[1] to promote the interests of the existing Rwandan government in the United States and to portray the RPF as a marginal, possibly terrorist, organization. Approximately a week later, on July 15, the United States Department of State issued a Note Verbale requiring the cessation of operations of the diplomatic mission of the Rwandan Embassy and directing Ambassador Uwimana to depart the United States no later than July 22, 1994, and other embassy personnel and the ambassador's family to depart no later than August 14, 1994. The Note specifically did not sever diplomatic relations with Rwanda, but left open the potential to resume active diplomatic relations at an appropriate time in the future. It also permitted one of the ambassador's subordinates, Boniface Karani, to remain in the United States to oversee the closing of the Embassy, the disposition of its property, and the departure of other Embassy personnel.

Respondent knew of the Note's issuance no later than July 16. Nonetheless, on July 21, 1994, the day before the ambassador was to surrender his credentials to the Department of State, respondent wrote to Mr. Uwimana proposing a set of "ongoing/new projects" for a fee of $55,000. These "projects" consisted primarily of seeking asylum for the ambassador and his family, and two of his subordinates, Mr. Karani and Jean–Baptiste Rwakazina, and their families, so they would not have to return to the dangerous situation in Rwanda. On his last day as ambassador, Mr. Uwimana agreed to respondent's proposal and approved a payment that was signed

---

1. The payment was made by check drawn against funds in the Rwandan Embassy's account and was payable to the "Robert Johnson II Trust fund."

by Mr. Rwakazina as First Secretary of the Rwandan Legation, and Mr. Karani, the Embassy's counselor. Respondent knew the funds were derived from the Rwandan government and not from the three men individually since the check identified the payor as "L'Ambassade de la Republique Rwandaise." Ambassador Uwimana then surrendered his credentials and respondent deposited the check.

A few weeks later, Mr. Uwimana wrote to respondent and informed him that neither Mr. Karani nor Mr. Rwakazina required immigration services any longer, and that he would like to discuss using the funds allocated to assist them to pay for additional legal, investigative and public relations services in his own case. On August 17, 1994, Mr. Uwimana wrote again and directed respondent to pay up to $15,000 in funds allocated under the July letter agreement to Washington World Group, Inc. ("WWG"), another lobbying firm, which respondent served as outside counsel and in which one of his RWG partners was a principal.

In the meantime, Mr. Karani had been reappointed as the legal representative of the Rwandan government after the RPF had gained control of the country. His appointment was recognized by the United States State Department and on September 6, 1994, he wrote to respondent to specifically request the return of the funds that had been set aside for his and Mr. Rwakazina's asylum requests. At that time respondent had $5,051.27 of those funds remaining in his trust account, but he refused to return them and stated he would only take instructions from Mr. Uwimana. He made this assertion even though he knew that Mr. Uwimana was no longer an accredited representative and that the United States had recognized the government controlled by the RPF as the legitimate government of Rwanda. He erroneously, but in good faith, believed that Mr. Uwimana was still a legitimate representative of the predecessor Hutu government that had fled to western Rwanda and was recognized by France and other nations.

On September 27, 1994, Mr. Uwimana directed respondent not to return the remaining funds, but to apply them to immigration services for Mr. Uwimana and his family. A few days later respondent disbursed $4,500 to WWG for work it had already performed, leaving a total of $551.27 claimed by the RPF government in his trust account. Further correspondence was exchanged between respondent and the Rwandan Embassy in which the Embassy demanded, and the respondent refused, a refund of the $55,000 paid to him by the predecessor Hutu government represented by Mr. Uwimana. As the RPF government had received no benefit from the $55,000 paid to respondent, it filed suit against him and RWG in the United States District Court for the District of Columbia. That suit resulted in the decision noted above, in which the court concluded that respondent had engaged in conversion and had breached his fiduciary duty to his client, the RPF government of Rwanda. Respondent noted an appeal, but the United States Court of Appeals for the District of Columbia Circuit affirmed the judgment, although it did remand the case for the trial court to reconsider the amount of punitive damages it had assessed.[2] The parties then negotiated a settlement of the punitive damages award and executed a stipulation of dismissal.

Bar Counsel, however, had begun its investigation, and on January 22, 2009, the parties filed a Petition for Negotiated Dis-

---

**2.** *Gov't of Rwanda v. Johnson,* 366 U.S.App. D.C. 98, 409 F.3d 368 (2005).

cipline and supporting Affidavit with the Board on Professional Responsibility ("Board") in which they stipulated to the preceding facts and agreed that respondent had violated District of Columbia Rule of Professional Conduct 1.15(c) by failing to safeguard and hold in trust funds which he held at a time that a dispute arose among persons claiming an interest in them. The parties also agreed a 30–day suspension was the appropriate sanction in this case.[3] The Board referred the petition to Hearing Committee Number Seven, and following a pre-hearing conference on March 3, 2009, and hearing on March 10, 2009—at which respondent reaffirmed his admission to all of the factual allegations in the petition, acknowledged that each constituted a violation of the Rules of Professional Conduct, stated that he understood the ramifications of the proposed sanction, and had not been coerced, placed under duress, nor promised anything that was not contained in the petition[4]—the Committee issued the report now before this court that recommends the negotiated sanction be imposed.[5]

■ Having reviewed it in accordance with our procedures in uncontested discipline cases,[6] we will accept the Hearing Committee's Report and Recommendation approving the petition for negotiated discipline. But given the novelty of this process, the questions raised by all Committee members over the adequacy of the Petition and Amended Petition in this case, and in order to provide the requested guidance on the proper scope of a Hearing Committee's review of negotiated petitions, we are departing from the brevity of disposition that

both we and D.C. Bar R. XI, § 12.1(d) expect to be the norm in these cases.[7]

■ There are two items requiring discussion. The first is the adequacy of the Petition and Amended Petition for Negotiated Discipline filed in this case. The relevant section of the Petition states: "Bar Counsel has not made any promises or offered any inducements to Respondent regarding this or any other present or future proceeding." At the pre-hearing conference, the Committee Chair stated "[t]his obviously raises the question of whether Bar Counsel intends to pursue in other proceedings, charges that might arise from other findings and conclusions that are referred to in the petition." In response, Bar Counsel stated it was an interesting question, and that his office would in the future consider further the need to make clear exactly "what's on the table" and why, but that the only "promise" made to respondent was that this case would be ended if the negotiated discipline was accepted. Another member of the Committee noted in closing that "the promises made by Bar Counsel, need to always be explicit, in order for it [sic] to be considered."

The question was subsequently revisited at the hearing, when the Chair noted that while there was no specific rule authorizing the Committee to reject a petition as defective, that was his "present inclination." The parties were then invited to explain why it should not be so rejected. The Assistant Bar Counsel first noted the statement in the Petition was consistent

---

3. The parties later filed an Amended Petition for Negotiated Discipline on March 18, 2009, as we discuss below.

4. Bd. Prof. Resp. R. 17.5; D.C. Bar R. XI, § 12.1(c) (2009).

5. Bd. Prof. Resp. R. 17.6.

6. D.C. Bar R. XI, § 12.1(d) (2009).

7. For this same reason we have recited the relevant facts in greater detail than we anticipate will ordinarily be necessary.

with the language of the Board's rule,[8] but that to the extent any question was left open about its scope he stated the "negotiated disposition would resolve all of the issues set forth in Bar Counsel's docketed matter 2002–D–414[ ]" and that no additional charges would be brought. Reluctantly accepting this assertion, as well as that of Bar Counsel himself at the prehearing conference, a second member of the Committee urged Bar Counsel not to correct petition deficiencies by transcript and not to create or use form language, but instead to amend the petition to clarify the extent of the deal between the parties.

Following the hearing the parties did just that and filed an Amended Petition for Negotiated Discipline. It is identical to the original petition, except that paragraph twenty-four reads:

> Bar Counsel has not made any promises or offered any inducements to Respondent regarding this or any other present or future proceeding. If the Hearing Committee approves of this negotiated disposition, Bar Counsel will not pursue against Respondent any other disciplinary violations that could have been brought against him in Bar Docket No. 2002–D414, based upon his conduct described in Section II above [the Stipulation of Facts and Charges], or based upon the findings of fact and conclusions of law of the United States District Court Judge in the matter styled *Government of Rwanda v. Rwanda Working Group, et al.,* and the opinion and order of the United States Court of Appeals for the District of Columbia Circuit in the same matter.

In its Report, the Hearing Committee considers this "barely adequate." And while we may disagree with that precise characterization, in light of the statements made by the parties at the hearing and the prehearing conference, we do agree that the Committee's subsequent suggestions to delete the first sentence and to indicate that Bar Counsel's promises will turn on this court's acceptance of the negotiated discipline, rather than the Committee's, make for a stronger statement that complies with both the Board's rules and this court's.[9]

■ The second question requiring discussion is the scope of a hearing committee's review of a petition for negotiated discipline. In this case, the Chair has issued a vigorous dissent from the majority's decision to recommend that we accept the negotiated discipline. He contends that the decisions of the United States District Court and the United States Court of Appeals must be considered in the committee's review, particularly when, as here, they might reasonably support a far more extensive series of disciplinary charges than those Bar Counsel has agreed to in the Negotiated and Amended Negotiated Petitions. We agree with both the majority and the Chair that a committee's review must be thorough and there is no automatic presumption that a negotiated petition for discipline should be approved. However, we cannot agree with the Chair's further assertion that a hearing committee's historic power to draw broad conclusions of law remains its function in the context of a negotiated discipline and thus allows it to question Bar Counsel's decision not to bring certain charges.

■ According to D.C. Bar R. XI, § 12.1(c) (2009), a hearing committee will recommend approval of a negotiated discipline if it finds that (1) the attorney knowingly and voluntarily acknowledges the facts and misconduct stated in the petition and agrees to the sanction it identifies, (2)

---

8. Bd. Prof. Resp. R. 17.3(a)(iii).

9. Bd. Prof. Resp. R. 17.3(a)(iii); D.C. Bar R. XI, 12.1(b)(1)(iii) (2009).

the facts stated in the petition or demonstrated at the hearing support the admission of misconduct and the agreed-upon sanction, and (3) that sanction is justified. In so circumscribing the committee's options, the rule distinctly limits the powers that committees "historically" possessed under D.C. Bar R. XI, §§ 5(c)(1)-(2), 9(a) (2008). Under those provisions committees are indeed allowed to conduct hearings, make findings, and submit a report and a recommendation to the Board, but only in cases where formal charges of misconduct have been brought or on other matters as directed by the Board.[10] A committee's discretion to make findings in this context is limited to ascertaining that "[t]he facts *set forth in the petition or as shown at the hearing* support the admission of misconduct."[11] Its ability to draw conclusions of law is now similarly limited to determining that "[t]he sanction agreed upon is justified."[12] We agree with the majority in this case that some consideration may be given to what charges might have been brought, but only to ensure that Bar Counsel is not offering an unduly lenient sanction—the ultimate focus must be on the propriety of the sanction itself. Accordingly, it is,

ORDERED that Robert W. Johnson, II, is suspended from the practice of law in the District of Columbia for the period of thirty days. For the purpose of seeking reinstatement to the Bar, respondent's suspension will not begin until he complies with the affidavit requirements of D.C. Bar R. XI, § 14(g).

*So ordered.*

10. D.C. Bar R. XI, § 5(c)(1) (2008).

11. D.C. Bar R. XI, § 12.1(c)(2) (2009) (emphasis added).