BROWN, Circuit Judge,
dissenting in part:
One critic has called it “wrecking-ball benevolence,” James Bovard, Editorial, Nothing Down: The Bush Administration’s Wrecking-Ball Benevolence, Barron’s, Aug. 23, 2004, http://tinyurl.com/ Barrons-Bovard; while another, dismissing the compassionate rhetoric, dubs it “crony capitalism,” Gerald P. O’Driscoll, Jr., Commentary, Fannie/Freddie, Bailout Baloney, CATO Inst., http://tinyurl.com/ Cato-O-Driscoll (last visited Feb. 13, 2017). But whether the road was paved with good intentions or greased by greed and indifference, affordable housing turned out to be the path to perdition for the U.S. mortgage market. And, because of the dominance of two so-called Government Sponsored Entities (“GSE”s) — the Federal National Mortgage Association '(“Fannie Mae” or “Fannie”) and the Federal Home Loan Mortgage Corporation (“Freddie Mac” or “Freddie,” collectively with Fannie Mae, the “Companies”) — the trouble that began in the subprime mortgage market metastasized until it began to affect most debt markets, both domestic and international.
By 2008, the melt-down had become a crisis. A decade earlier, government policies and regulations encouraging greater home ownership pushed banks to underwrite mortgages to allow low-income borrowers with poor credit history to purchase homes they could not afford. Banks then used these risky mortgages to underwrite highly-profitable mortgage-backed *1115 securities — bundled mortgages — which hedge funds and other investors later bought and sold, further stoking demand for ever-riskier mortgages at ever-higher interest rates. Despite repeated warnings from regulators and economists, the GSEs’ eagerness to buy these loans meant lenders had a strong incentive to make risky loans and then pass the risk off to Fannie and Freddie. By 2007, Fannie and Freddie had acquired roughly a trillion dollars’ worth of subprime and nontraditional mortgages — approximately 40 percent of the value of all mortgages purchased. And since more risk meant more profit and the GSEs knew they could count on the federal government to cover their losses, their appetite for riskier mortgages was entirely rational.
The housing boom generated tremendous profit for Fannie and Freddie. But then the bubble burst. Individuals began to default on their loans, wrecking neighborhoods, wiping out the equity of prudent homeowners, and threatening the stability of banks and those who held or guaranteed mortgage-backed assets. In March 2008, Bear Sterns collapsed, requiring government funds to finance a takeover by J.P. Morgan Chase. In July, the Federal Deposit Insurance Corporation (the “FDIC”) seized IndyMac. But Bear Sterns and In-dyMac — huge companies, to be sure — paled in comparison to Fannie and Freddie, which together backed $5 trillion in outstanding mortgages, or nearly half of the $12 trillion U.S. mortgage market. In late-July 2008, Congress passed and President Bush signed the Housing and Economic Recovery Act of 2008, authorizing a new government agency, the Federal Housing Finance Agency (“FHFA” or the “Agency”), to serve as conservator or receiver for Fannie and Freddie if certain conditions were met; Fannie and Freddie were placed into FHFA conservatorship the following month. Only weeks thereafter, Lehman Brothers failed, the government bailed out A.I.G., Washington Mutual declared bankruptcy, and -Wells Fargo obtained government assistance for its buyout of Wachovia.
There is no question that FHFA was created to confront a serious problem for U.S. financial markets. Thé Court apparently concludes a crisis of this magnitude justifies extraordinary actions by Congress. Perhaps it might. But even in a time of exigency, a nation governed by the rule of law cannot transfer broad and unreviewable power to a government entity to do whatsoever it wishes with the assets of these Companies. Moreover, to remain within constitutional parameters, even a less-sweeping delegation of authority would require an explicit and comprehensive framework. See Whitman v. Am. Trucking Ass’ns, Inc., 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (“Congress ... does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — it does not, one might say, hide elephants in mouse-holes.”) Here, Congress did not endow FHFA with unlimited authority to pursue its own ends; rather, it seized upon the statutory text that had governed the FDIC for decades and adapted it ever so slightly to confront the new challenge posed by Fannie and Freddie.
Perhaps this was a bad idea. The perils of massive GSEs had been indisputably demonstrated. Congress could have faced up to the mess forthrightly. Had both Companies been placed into immediate receivership, the machinations that led to this litigation might have been avoided. See Thomas H. Stanton, The Failure of Fannie Mae and Freddie Mac and the Future of Government Support for the Housing Finance System, 14-15 (Brooklyn L. Sch., Conference Draft, Mar. 27, 2009), http://tinyúrl.com/Stanton-Conference (arguing Fannie and Freddie could have been *1116 converted into wholly owned government corporations with limited lifespans in order to stabilize the mortgage market). But the question before the Court is not whether the good guys have stumbled upon a solution. There are no good guys. The question is whether the government has violated the legal limits imposed on its own authority-
Regardless of whether Congress had many options or very few, it chose a well-understood and clearly-defined statutory framework — one that drew upon the common law to clearly delineate the outer boundaries of the Agency’s conservator or, alternatively, receiver powers. FHFA pole vaulted over those boundaries, disregarding the plain text of its authorizing statute and engaging in ultra vires conduct. Even now, FHFA continues to insist its authority is entirely without limit and argues for a complete ouster of federal courts’ power to grant injunctive relief to redress any action it takes while purporting to serve in the conservator role. See FHFA Br. 21. While I agree with much of the Court’s reasoning, I cannot conclude the anti-injunction provision protects FHFA’s actions here or, more generally, endorses FHFA’s stunningly broad view of its own power. Plaintiffs — not all innocent and ill-informed investors, to be sure — are betting the rule of law will prevail. In this country, everyone is entitled to win that bet. Therefore, I respectfully dissent from the portion of the Court’s opinion rejecting the Institutional and Class Plaintiffs’ claims as barred by the anti-injunction provision and all resulting legal conclusions.
I.
The Housing and Economic Recovery Act of 2008 (“HERA” or the “Act”), Pub. L. No. 110-289, 122 Stat. 2654 (codified at 12 U.S.C. § 4511, et seq.), established a new financial regulator, FHFA, and endowed it with the authority to act as conservator or receiver for Fannie and Freddie. The Act also temporarily expanded the United States Treasury’s (“Treasury”) authority to extend credit to Fannie and Freddie as well as purchase stock or debt from the Companies. My disagreement with the Court turns entirely on its interpretation of HERA’s text.
Pursuant to HERA, FHFA may supervise and, if needed, operate Fannie and Freddie in a “safe and sound manner,” “consistent with the public interest,” while “foster[ing] liquid, efficient, competitive, and resilient national housing finance markets.” 12 U.S.C. § 4513(a)(1)(B). The statute further authorizes the FHFA Director to “appoint [FHFA] as conservator or receiver” for Fannie and Freddie “for the purpose of reorganizing, rehabilitating, or winding up [their] affairs.” Id. § 4617(a)(1), (2) (emphasis added). In order to ensure FHFA would be able to act quickly to prevent the effects of the sub-prime mortgage crisis from cascading further through the United States and global economies, HERA also provided “no court may take any action to restrain or affect the exercise of powers or functions of [FHFA] as a conservator or a receiver.” Id. § 4617(f) (emphasis added).
By its plain terms, HERA’s broad anti-injunction provision bars equitable relief against FHFA only when the Agency acts within its statutory authority-^-ie. when it performs its “powers or functions.” See New York v. FERC, 535 U.S. 1, 18, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002) (“[A]n agency literally has no power to act ... unless and until Congress confers power upon it.”). Accordingly, having been appointed as “conservator” for the Companies, FHFA was obligated to behave in a manner consistent with the conservator role as it is defined in HERA or risk intervention by courts. Indeed, this conclusion is consistent with judicial interpreta *1117 tions of HERA’s sister statute and, more broadly, with the common law.
A.
FHFA’s general authorization to act appears in HERA’s “[discretionary appointment” provision, which states, “The Agency may, at the discretion of the Director, be appointed conservator or receiver” for Fannie and Freddie. 12 U.S.C. § 4617(a)(2) (emphasis added). The disjunctive “or” clearly indicates FHFA may choose to behave either as a conservator or as a receiver, but it may not do both simultaneously. ' Se$ also id. § 4617(a)(4)(D) (“The appointment of the Agency as receiver of a regulated entity under this section shall immediately terminate any conservatorship established for the regulated entity under this chapter.”). The Agency chose the first option, publicly announcing it had placed Fannie and Freddie into conservatorship on September 6, 2008 after a series of unsuccessful efforts to capitalize the Companies. They remain in FHFA conservatorship today. Accordingly, we must determine the statutory boundaries of power, if any, placed on FHFA when it functions as a conservator and determine whether FHFA stepped out of bounds.
The Court emphasizes Subsection 4617(b)(2)(B)’s general overview of the Agency’s purview:
The Agency may, as conservator or receiver—
(i) take over the assets of and operate the regulated entity with all the powers of the shareholders, the directors, and the officers of the regulated entity and conduct all business of the regulated entity;
(ii) collect all obligations and money due the regulated entity;
(in) perform all functions of the regulated entity in the name of the regulated entity which are consistent with the appointment as conservator or receiver;
(iv) preserve and conserve the assets and property of the regulated entity; and
(v) provide by contract for assistance in fulfilling any function, activity, action, or duty of the Agency as conservator or receiver.
Id. § 4617(b)(2)(B). From this text, the Court intuits a general statutory mission to behave as a “conservator” in virtually all corporate actions, presumably transitioning to a “receiver” only at the moment of liquidation. Op. 1091 (“[HERA] openly recognizes that sometimes conservatorship will involve managing the regulated entity in the lead up to the appointment of a liquidating receiver.”); 1093 (“[T]he duty that [HERA] imposes on FHFA to comply with receivership procedural protections textually turns on FHFA actually liquidating the Companies.”). In essence, the Court’s position holds that because there was a financial crisis and only Treasury offered to serve as White Knight, both FHFA and Treasury may take any action they wish, apart from formal liquidation, without judicial oversight. This analysis is dangerously far-reaching. See generally 2 James Wilson, Of the Natural Rights of Individuals, in The Works of James Wilson 587 (1967) (warning it is not “part of natural liberty ... to do mischief to anyone” and suggesting such a nonexistent right can hardly be given to the state to impose by fiat). While the line between a conservator and a receiver may not be completely impermeable, the roles’ heartlands are discrete, well-anchored, and authorize essentially distinct and specific conduct.
For clarification of the general mission statement appearing in Subsection (B), the reader need only continue to read through Subsection 4617(b)(2). See Kellmer v. *1118 Raines, 674 F.3d 848, 850 (D.C. Cir. 2012) (“[T]o resolve this [statutory interpretation of HERA] issue, we need only heed Professor Frankfurter’s timeless advice: ‘(1) Read the statute; (2) read the statute; (3) read the statute!’” (quoting Henry J. Friendly, Mr. Justice Frankfurter and the Reading of Statutes, in Benchmarks 196, 202 (1967))).
A mere two subsections later, HERA helpfully lists the specific “powers” that FHFA possesses once appointed conservator:
.The Agency may, as conservator, take such action as may be—
(i) necessary to put the regulated entity in a sound and solvent condition; and
(ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity.
12 U.S.C. § 4617(b)(2)(D) (emphasis added). The next subsection defines FHFA’s “[a]dditional powers as receiver:”
In any case in which the Agency is acting as receiver, the Agency shall place the regulated entity in liquidation and proceed to realize upon the assets of the regulated entity in such manner as the Agency deems appropriate, including through the sale of assets, the transfer of assets to a limited-life regulated entity[,] ... or the exercise of any other rights or privileges granted to the Agency under this paragraph.
Id. § 4617(b)(2)(E) (emphasis added). Apparently, when the Court asserts “for all of their arguments that FHFA has exceeded the bounds of conservatorship, the institutional stockholders have no textual hook on which to hang their hats,” Op. 1095, it refers solely to the limited confines of Subsection 4617(b)(2)(B).
Plainly the text of Subsections 4617(b)(2)(D) and (b)(2)(E) mark the bounds of FHFA’s conservator or receiver powers, respectively, if and when the Agency chooses to exercise them in a manner consistent with its general authority to “operate the regulated entity” appearing in Subsection 4617(b)(2)(B).[1] Of course, this is not to say FHFA may take action if and only if the preconditions listed in the statute are met. Indeed, in provisions following the specific articulation of powers contained in Subsections (D) and (E), and thus drafted in contemplation of the distinctions articulated in those earlier subsections, the statute lists certain powers that may be exercised by FHFA as either a “conservator or receiver.” 12 U.S.C. *1119 § 4617(b)(2)(G) (power to “transfer or sell any asset or liability of the regulated entity in default” without prior approval by the regulated entity); id. § 4617(b)(2)(H) (power to “pay [certain] valid obligations of the regulated entity”). Indeed, each of these powers is entirely consistent with either the Subsection (D) conservator role or the Subsection (E) receiver role, and they do not override the distinctions between them. Congress cannot be expected to specifically address an entire universe of possible actions in its enacted text— assigning each to a “conservator,” a “receiver,” or both. See, e.g., id. § 4617(b)(2)(C) (joint conservator/receiver power to “provide for the exercise of any function by any stockholder, director, or officer of any regulated entity”). But if a power is enumerated as that of a “receiver” (or fairly read to be a “receiver” power), FHFA cannot exercise that power while calling itself a “conservator.” The statute confirms as much: the Agency “as conservator or receiver” may “exercise all powers and authorities specifically granted to conservators or receivers, respectively, under [Section 4617], and such incidental powers as shall be necessary to carry out such powers.” Id. § 4617(J)(i) (emphasis added).
A conservator endeavors to “put the regulated entity in a sound and solvent condition” by “reorganizing [and] rehabilitating” it, and a receiver takes steps towards “liquidating]” the regulated entity by “winding up [its] affairs.” 12 U.S.C. § 4617(a)(2), (b)(2)(D)-(E).[2] In short, FHFA may choose whether it intends to serve as a conservator or receiver; once the choice is made, however, its “hard operational calls” consistent with its “managerial judgment” are statutorily confined to acts within its chosen role. See Op. 1089. There is no such thing as .a hybrid conservator-receiver capable of governing the Companies in any manner it chooses up to the very moment of liquidation. See Op. 1104-05 (noting HERA “terminates [shareholders] rights and claims” in receivership and acknowledging shareholders’ direct claims against and rights in the Companies survive during conservatorship).[3]
Moreover, it is the proper role of courts to determine whether FHFA’s challenged actions fell within its statutorily-defined conservator role. In County of Sonoma v. FHFA, for example, when our sister circuit undertook this inquiry, it observed, “If the [relevant] directive falls within FHFA’s conservator powers, it is insulated from review and this case must be dismissed,” but “[conversely, the anti-judicial review provision is inapplicable when FHFA acts beyond the scope of its conservator power.” 710 F.3d 987, 992 (9th Cir. 2013); see also Leon Cty. v. FHFA, 700 F.3d 1273, 1278 (11th Cir. 2012) (“FHFA cannot evade judicial scrutiny by merely *1120 labeling its actions with a conservator stamp.”)- Here, the Court abdicates this crucial responsibility, blessing FHFA with unreviewable discretion over any action.— short of formal liquidation — it takes towards its wards.
B.
But HERA does not exist in an interpretive vacuum. Congress imported the powers and limitations FHFA enjoys in its “conservator” and “receiver” roles, as well as the insulation from judicial review that accompanies them, directly from the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (“FIRREA”), Pub. L. No. 101-73, 103 Stat. 183, which governs the FDIC. See Mark A. Calabria, The Resolution of Systemically Important Financial Institutions: Lessons from Fannie and Freddie 10 (Cato Inst., Working Paper No. 25, 2015), http://tinyurl.com/ Cato-Working-Paper (“In crafting the conservator and receivership provisions ... the Committee staff ... quite literally ‘marked up’ Sections 11 and 13 of the [Federal Deposit Insurance Act (“FDIA”), FIRREA’s predecessor statute].... The presumption was that FDIA powers would apply to a GSE resolution, unless there was a compelling reason otherwise.”). Our interpretation of conservator powers and the judiciary’s role in policing their boundaries under HERA is, therefore, guided by congressional intent expressed in FIR-REA and the case law interpreting it. See Lorillard v. Pons, 434 U.S. 575, 580-81, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) (noting when “Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law” and to have “adopte[d] that interpretation”); Motion Picture Ass’n of Am., Inc. v. FCC, 309 F.3d 796, 801 (D.C. Cir. 2002) (“Statutory provisions in pari materia normally are construed together to discern their meaning.”); see also Felix Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 537 (1947) [hereinafter Reading of Statutes] (“[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.”).
In language later copied word-for-word into HERA, FIRREA lists the FDIC’s powers “as conservator or receiver,” 12 U.S.C. § 1821(d)(2)(A)-(B), and it later lists the FDIC’s “[p]owers as conservator” alone, id. § 1821(d)(2)(D). Save for references to a “regulated entity” in place of a “depository institution,” the conservator powers delineated in the two statutes are identical. In fact, FIRREA’s text demonstrates the Legislature’s clear intent to create a textual distinction between conservator and receiver powers:
The FDIC is authorized to act as conservator or receiver for insured banks and insured savings associations that are chartered under Federal or State law. The title also distinguishes between the powers of a conservator and receiver, making clear that a conservator operates or disposes of an institution as a going concern while a receiver has the power to liquidate and wind up the affairs of an institution.
H.R. Rep. No. 101-209, at 398 (1989) (Conf. Rep.) (emphasis added). Courts have respected this delineation, noting “Congress did not use the phrase ‘conservator or receiver’ loosely.” 1185 Ave. of Americas Assocs. v. RTC, 22 F.3d 494, 497 (2d Cir. 1994) (“Throughout FIRREA, Congress used ‘conservator or receiver’ where it granted rights to both conservators and receivers, and it used ‘conservator’ or ‘receiver’ individually where it granted rights to the [agency] in only one capacity.”).
FIRREA had assigned to “conservators” responsibility for taking “such action as may be ... necessary to put the in *1121 sured depository institution in a sound and solvent condition; and ... appropriate to carry on the business of the institution and preserve and conserve [its] assets,” 12 U.S.C. § 1821(d)(2)(D), and it imposed upon them a “fiduciary duty to minimize the institution’s losses,” 12 U.S.C. § 1831f(d)(3). “Receivers,” on the other hand, “place the insured depository institution in liquidation and proceed to realize upon the assets of the institution.” Id. § 1821(d)(2)(E). The proper interpretation of the text is unmistakable: “a conservator may operate and dispose of a bank as a going concern, while a receiver has the power to liquidate and wind up the affairs of an institution.” James Madison Ltd. ex rel. Hecht v. Ludwig, 82 F.3d 1085, 1090 (D.C. Cir. 1996); see also, e.g., Del E. Webb McQueen Dev. Corp. v. RTC, 69 F.3d 355, 361 (9th Cir. 1995) (“The RTC [a government agency similar to the FDIC], as conservator, operates an institution with the hope that it might someday be rehabilitated. The RTC, as receiver, liquidates an institution and distributes its proceeds to creditors according to the priority rules set out in the regulations.”); RTC v. United Tr. Fund, Inc., 57 F.3d 1025, 1033 (11th Cir. 1995) (“The conservator’s mission is to conserve assets[,] which often involves continuing an ongoing business. The receiver’s mission is to shut a business down and sell off its assets. A receiver and conservator consider different interests when making ... strategic decision[s].”). The two roles simply do not overlap, and any conservator who “winds up the affairs of an institution” rather than operate it “as a going concern” — within the context of a formal liquidation or not — does so outside its authority as conservator under the statute.
Of course, parameters for the “conservator” and “receiver” roles are not the only things HERA lifted directly from FIR-REA. The anti-injunction clause at issue here came too. Section 1821(j) of FIRREA provided, “[N]o court may take any action, except at the request of the Board of Directors by regulation or order, • to restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver.” 12 U.S.C. § 1821(j). Another near-perfect fit.
Indeed, National Trust for Historic Preservation in the United States v. FDIC emphasized that, while FIRREA’s anti-injunction clause prevented review of the FDIC’s actions where it had “exercise[d the] powers or functions” granted to it as “conservator or receiver,” the Court retained the ability to decide claims alleging the agency “ha[d] acted or propose[d] to act beyond, or contrary to, its statutorily prescribed, constitutionally permitted, powers or functions.” 21 F.3d 469, 472 (D.C. Cir. 1994) (Wald, J., concurring); see also Freeman v. FDIC, 56 F.3d 1394, 1398 (D.C. Cir. 1995) (‘“[Section] 1821© does indeed bar courts from restraining or affecting the exercise of powers or functions of the FDIC as a conservator or a receiver ... unless it has acted or proposed to act beyond, or contrary to, its statutorily prescribed, constitutionally permitted, powers or functions.’ ” (quoting Nat’l Tr. for Historic Pres., 21 F.3d at 472 (Wald, J., concurring))). Insulating all actions within the conservator role is an entirely different proposition from exempting actions outside that role, and this Circuit’s precedent leaves no doubt that a thorough analysis is required to determine where on the continuum an agency stands before applying FIRREA’s — or HERA’s — anti-injunction clause to bar a plaintiffs claims.
C.
When Congress lifted HERA’s conser-vatorship standards verbatim from FIR-REA, it also incorporated the long history of fiduciary conservatorships at common law baked into that statute. Indeed, “[i]t is a familiar maxim that a statutory term is *1122 generally presumed to have its common-law meaning.” Evans v. United States, 504 U.S. 255, 259, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992); see Morissette v. United States, 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952) (“[Wjhere Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.”); see generally Roger J. Traynor, Statutes Revolving in Common-Law Orbits, 17 Cath. U. L. Rev. 401 (1968) (discussing the interaction between statutes and judicial decisions across a number of fields, including commercial law). As Justice Frankfurter colorfully put it, “[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.” Reading of Statutes, supra, at 537.
We have an obvious transplant here. At common law, “conservators” were appointed to protect the legal interests of those unable to protect themselves. In the probate context, for example, a conservator was bound to act as the fiduciary of his ward. See In re Kosmadakes, 444 F.2d 999, 1004 (D.C. Cir. 1971). This duty forbade the conservator — whether overseeing a human or corporate person — from acting for the benefit of the conservator himself or a third party. See RTC v. CedarMinn Bldg. Ltd. P’ship, 956 F.2d 1446, 1453-54 (8th Cir. 1992) (observing “[a]t least as early as the 1930s, it was recognized that the purpose of a conservator was to maintain the institution as an ongoing concern,” and holding “the distinction in duties between [RTC] conservators and receivers” is thus not “more theoretical than real”).[4]
Consequently, today’s Black’s Law Dictionary defines a “conservator” as a “guardian, protector, or preserver,” while a “receiver” is a “disinterestéd person appointed ... for the protection or collection of property that is the subject of diverse claims (for example, because it belongs to a bankrupt [entity] or is otherwise, being litigated).” Black’s Law Dictionary 370, 1460 (10th ed. 2014). These “[w]ords that have acquired a specialized meaning in the legal context must be accorded their legal meaning.” Buckhannon Bd. & Care Home, Inc. v. W.V. Dep’t of Health & Human Res., 532 U.S. 598, 615, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) (Scalia, J., concurring).[5] They comprise the common law vocabulary that Congress chose to employ in FIR-REA and, later, in HERA to authorize the FDIC and FHFA to serve as “conservators” in order to “preserve and conserve [an institution’s] assets” and operate that institution in a “sound and solvent” manner. 12 U.S.C. § 1821(d)(2)(D).
*1123 The word “conservator,” therefore, is not an infinitely malleable term that may be stretched and contorted to encompass FHFA’s conduct here and insulate Plaintiffs’ APA claims from judicial review. Indeed, the Court implicitly acknowledges this fact in permitting the Class Plaintiffs to mount a claim for anticipatory breach of the promises in their shareholder agreements. See Op. 1113-14. A proper reading of the statute prevents FHFA from exceeding the bounds of the conservator role and behaving as a defacto receiver.
The Court suggests FHFA’s incidental power to, “as conservator or receiver!,] ... take any action authorized by [Section 4617], which the Agency determines is in the best interests of the regulated entity or the Agency” in 12 U.S.C. § 4617(b)(2)(J)(ii) erases any outer limit to FHFA’s statutory powers despite the common law definition of “conservator” and, therefore, forecloses any opportunity for meaningful judicial review of FHFA’s actions in conducting its so-called conserva-torship at the time of the Third Amendment. See Op. 1093-94. Of course, the Court’s reading of Subsection 4617(b) (2) (J) (ii) directly contradicts the immediately-preceding subsection’s authorization of FHFA “as conservator or receiver” to “exercise all powers and authorities specifically granted to conservators or receivers, respectively.” 12 U.S.C. § 4617(b)(2)(J)(i) (emphasis added). It also upends Subsection 4617(a)(5)’s provision of judicial review for actions FHFA may take in certain facets of its receiver role. But even if that were not the case, Supreme Court precedent requires an affirmative act by Congress — an explicit “instruction]” that review should proceed in a “contrary” manner — to authorize departure from a common law definition. Morissette, 342 U.S. at 263, 72 S.Ct. 240. And given the potential for disruption in the financial markets discussed in Part III infra, one would expect Congress to express itself explicitly in this matter. See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 160, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (“[W]e are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion.”). Congress offered no such statement here.
Rather, the more appropriate reading of the relevant text merely permits FHFA to engage in self-dealing transactions, an authorization otherwise inconsistent with the conservator role. See Gov’t of Rwanda v. Johnson, 409 F.3d 368, 373 (D.C. Cir. 2005) (discussing “the age-old principle applicable to fiduciary relationships that, unless there is a full disclosure by the agent, trustee, or attorney of his activity and interest in the transaction to the party he represents and the obtaining of the consent of the party represented, the party serving in the fiduciary capacity cannot receive any profit or emolument from the transaction”); see also 7 Collier on Bankruptcy ¶ 1108.09 (16th ed.) (noting a trustee’s duty of loyalty in bankruptcy law requires a “single-minded devotion to the interests of those on whose behalf the trustee acts”). FHFA operating as a conservator may act in its own interests to protect both the Companies and the taxpayers from whom the Agency was ultimately forced to borrow, but FHFA is not empowered to jettison every duty a conservator owes its ward, and it is certainly not entitled to disregard the statute’s own clearly defined limits on conservator power.
In fact, FIRREA contains a nearly identical self-dealing provision, which provides, “The [FDIC] may, as conservator or receiver ... take any action authorized by this chapter, which the [FDIC] determines is in the best interests of the depository institution, its depositors, or the [FDIC].” *1124 12 U.S.C. § 1821(d)(2)(J)(ii). This authorization has not given courts pause in interpreting FIRREA to require the FDIC to behave within its statutory role. See Nat’l Tr. for Historic Pres., 21 F.3d at 472 (Wald, J., concurring) (“[Section] 1821(j) does indeed bar courts from restraining or affecting the exercise of powers or functions of the FDIC as a conservator or a receiver, unless it has acted or proposes to act beyond, or contrary to, its statutorily prescribed, constitutionally permitted, powers or functions.”); see also Sharpe v. FDIC, 126 F.3d 1147, 1155 (9th Cir. 1997) (holding the statutory bar on judicial review of the FDIC’s actions taken as a conservator or receiver “does not bar in-junctive relief when the FDIC has acted beyond, or contrary to, its statutorily prescribed, constitutionally permitted, powers or functions”).[6]
II.
Having determined this Court may enjoin FHFA if it exceeded its powers as conservator of Fannie and Freddie, I now examine FHFA’s conduct. It is important to note at the outset the motives behind any actions taken by FHFA are irrelevant to this inquiry, as no portion of HERA’s text invites such an analysis. Rather, I examine whether or not FHFA acted beyond its authority, looking only to whether its actions are consistent either with (1) “put[ting] the regulated entity in a sound and solvent condition” by “reorganizing, [and] rehabilitating” it as a conservator or (2) taking steps towards “liquidating]” it by “winding up [its] affairs” as a receiver. 12 U.S.C. § 4617(a)(2), (b)(2)(D)-(E).
In September 2008, FHFA placed Fannie and Freddie into conservatorship; Director James Lockhart explained the conservatorship as “a statutory process designed to stabilize a troubled institution with the objective of returning the entities to normal business operations” and promised FHFA would “act as the conservator to operate [Fannie and Freddie] until they are stabilized.” Press Release, Fed. Hous. Fin. Agency, Statement of FHFA Director James B. Lockhart at News Conference Announcing Conserva-torship of Fannie Mae and Freddie Mac (Sept. 7, 2008), http://tinyurl.com/ Lockhart-Statement. FHFA even promised it would “continue to retain all rights in the [Fannie and Freddie] stock’s financial worth; as such worth is determined by the market.” JA 2443 (FHFA Fact Sheet containing “Questions and Answers on Conservatorship”). And, for a period of time thereafter, FHFA did in fact manage the Companies within the conservator role. It even enlisted Treasury to provide cash infusions that, while costly, preserved at least a portion of the value of the market-held shares in the corporations.
But the tide turned in August 2012 with the Third Amendment and its “Net Worth Sweep,” transferring nearly all of the Companies’ profits into Treasury’s coffers. Specifically, the Third Amendment replaced Treasury’s right to a fixed-rate 10 percent dividend with the right to sweep *1125 Fannie and Freddie’s entire quarterly net worth (except for an initial capital reserve, which initially totaled $3 billion and will decline to zero by 2018). Additionally, the agreement provided that, regardless of the amount of money paid to Treasury as part of this Net Worth Sweep dividend, Fannie and Freddie would continue to owe Treasury the $187.5 billion it had originally loaned the Companies. It was, to say the least, a highly unusual transaction. Treasury was no longer another, admittedly very important, investor entitled to a preferred share of the Companies’ profits; it had received a contractual right from FHFA to loot the Companies to the guaranteed exclusion of all other investors.
In an August 2012 press release summarizing the Third Amendment’s terms, Treasury took a very different tone from Lockhart’s 2008 statement: “[W]e are taking the next step toward responsibly winding down Fannie Mae and Freddie Mac, while continuing to support the necessary process of repair and recovery in the housing market.” Press Release, Dep’t of Treasury, Treasury Department Announces Further Steps To Expedite Wind Down of Fannie Mae and Freddie Mac (Aug. 17, 2012), http://tinyurl.com/Treasury-Press-Release (emphasis added). Treasury further noted the Third Amendment would achieve the “important objective[ ]” of “[ajcting upon the commitment made in the Administration’s 2011 White Paper that the GSEs will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form.” Id. The Acting FHFA Director echoed Treasury’s sentiment in April 2013, explaining to Congress the following year the Net Worth Sweep would “wind down” Fannie and Freddie and “reinforce the notion that [they] will not be building capital as a potential step to regaining their former corporate status.” Statement of Edward J. DeMarco, Acting Director, FHFA, Before the S. Comm, on Banking, Hous. & Urban Affairs (Apr. 18, 2013), http://tinyurl.com/DeMarco-Statement.
The evolution of FHFA’s position from 2008 to 2013 is remarkable; it had functionally removed itself from the role of a HERA conservator. FHFA and Treasury even described their actions using HERA’s exact phrase defining a receiver’s conduct, yet FHFA still purported to exercise only its power as a conservator and operated free from HERA’s constraints on receivers. See 12 U.S.C. § 4617(a)(4)(D), (b)(2)(E), (b)(3), (c) (establishing liquidation procedures and priority requirements); id. § 4617(a)(5) (providing for judicial review).
The shift in policy was borne out in FHFA’s and Treasury’s actions. Indeed, all parties agree the Net Worth Sweep had the effect of replacing a fixed-rate dividend with a quarterly transfer of each company’s net worth above an initial (and declining) capital reserve of $3 billion. There is similarly no dispute that Treasury collected a $130 billion dividend in 2013, $40 billion in 2014, and $15.8 billion in 2015. In fact, during the period from 2008 to 2015, Fannie and Freddie together paid Treasury $241.2 billion, an amount well in excess of the $187.5 billion Treasury loaned the Companies. FHFA’s decision to strip these cash reserves from Fannie and Freddie, consistently divesting the Companies of their near-entire net worth, is plainly antithetical to a conservator’s charge to “preserve and conserve” the Companies’ assets.
Of course, and as the Court observes, Op. 1091-93, Fannie' and Freddie continue to operate at a profit. Indeed, as early as the second quarter of 2012, the Companies had outearned Treasury’s 10 percent cash dividend. Nonetheless, the Net Worth Sweep imposed through the Third Amendment — which was executed shortly after *1126 the second quarter 2012 earnings were released — confiscated all but a small portion of Fannie’s and Freddie’s profits. The maximum reserve of $3 billion, given the Companies’ enormous size, rendered them extremely vulnerable to market fluctúa-' tions and risked triggering a need to once again infuse Fannie and Freddie with taxpayer money. See JA 1983 (2012 SEC filing stating “there is significant uncertainty in the current market environment, and any changes in the trends in macroeconomic factors that [Fannie] currently anticipate[s], such as home prices and unemployment, may cause [its] future credit-related expenses or income and credit losses to vary significantly from [its then-]current expectations”). In fact, FHFA has since referred to the Companies, even with their several-billion-dollar cushion, as “effectively balance-sheet insolvent” and “a textbook illustration of instability.” Defs. Mot. to Dismiss at 19, Samuels v. FHFA, No. 13-cv-22399 (S.D. Fla. Dec. 6, 2013), ECF No. 38; see also generally, Statement of Melvin L. Watt, Director, FHFA, State-' ment Before the H. Comm, on Fin. Servs., at 3 (Jan. 27, 2015), http://tinyurl.com/ Watt-Statement (“[U]nder the terms of the [contracts with Treasury], the [Companies] do not have the ability to build capital internally while they remain in conserva-torship.”). As time went on, and the maximum reserve decreased, the situation only deteriorated. Given the task of replicating their successful rise each quarter amid volatile market conditions, it is surprising the Companies managed to maintain consistent profitability until 2016, when Freddie Mac posted a $200 million loss in the first quarter. See Freddie Mac, Form 10-Q por the Quarterly Period Ended March 31, 2016, at 7 (May 3, 2016). Under the circumstances, it strains credulity to argue FHFA was acting as a conservator to “observe[ Fannie’s and Freddie’s] economic performance over time” and consider other regulatory options when it executed the Third Amendment. Op. 1093-94. FHFA and Treasury are not “studying” the Companies, they are profiting off of them![7]
Nonetheless, the Court suggests the Third Amendment was simply a logical extension of the principles articulated in the prior two agreements. Op. 1089-90. This is incorrect; the Net Worth Sweep fundamentally transformed the relationship between the Companies and Treasury: a 10 percent dividend became a sweep of the Companies’ near-entire net worth; an in-kind dividend option disappeared in favor of cash payments; the ability to retain capital above and beyond the required dividend payment evaporated; and,, most importantly, the Companies lost any hope of repaying Treasury’s liquidation preference and freeing themselves, from its debt. Indeed, the capital depletion accomplished in the Third Amendment, regardless of motive, is patently incompatible with any definition of the conservator role. Outside the litigation context, even FHFA agrees: “As one of the primary objectives of conservatorship of a regulated entity would be restoring that regulated entity to a sound and solvent condition, allowing capital distributions to deplete the entity’s conservatorship assets would be inconsistent with the agency’s statutory goals, as they would result in removing *1127 capital at a time when the Conservator is charged with rehabilitating the regulated entity.” 76 Fed. Reg. 35,724, 35,727 (June 20, 2011). But rendering Fannie and Freddie mere pass-through entities for huge amounts of money destined for Treasury does exactly that which FHFA has deemed impermissible. Even Congress, in debating the Consolidated Appropriations Act of 2016, H.R. 2029, 114th Cong. § 702 (2015), acknowledged such action would require additional congressional authorization. See 161 Cong. Rec. S8760 (daily ed. Dec. 17, 2015) (statement of Sen. Corker) (noting the Senate Banking Committee passed a bipartisan bill to “protect taxpayers from future economic down-turns by replacing Fannie and Freddie with a privately capitalized system” that ultimately did not receive a vote by the full Senate).
Here, FHFA placed the Companies in de facto liquidation — inconsistent even with “managing the regulated entit[ies] in the lead up to the appointment of a liquidating receiver,” as the Court incorrectly, and obliquely, defines the outer limits of the conservator role, Op. 1091 — when it entered into the Third Amendment and captured nearly all of the Companies’ profits for Treasury. To paraphrase an aphorism usually attributed to Everett Dirksen, a hundred billion here, a hundred billion there, and pretty soon you’re talking about real money. But instead of acknowledging the reality of the Companies’ situation, the Court hides behind a false formalism, establishing a dangerous precedent for future acts of FHFA, the FDIC, and even common law conservators.
III.
Finally, the practical effect of the Court’s ruling is pernicious. By holding, contrary to the Act’s text, FHFA need not declare itself as either a conservator or receiver and then act in a manner consistent with the well-defined powers associated with its chosen role, the Court has disrupted settled expectations about financial markets in a manner likely to negatively affect the nation’s overall financial health.
Congress originally established the FDIC to rebuild confidence in our nation’s banking system following the Great Depression, see Banking Act of 1933, Pub. L. No. 73-66, 48 Stat. 162, and in the years that followed it has empowered the institution to insure deposits and serve as a conservator or receiver for failed banks, see Federal Deposit Insurance Act of 1950, Pub. L. No. 81-979, 64 Stat. 873 (FIR-REA’s predecessor statute, which incorporated the conservator and receiver roles). Consistent with its mission, the FDIC has provided assistance, up to and including conservatorship and receivership, for thousands of financial institutions over numerous periods of economic stress. For decades, investors relied on the common law’s conservator/receiver distinction, maintained by the FDIC and enforced by courts, to evaluate their investments and guide judicial review.
Congress chose to import this effective statutory scheme into HERA in an effort to combat our most recent financial crisis, evidencing its belief that FIRREA’s terms were equal to the task confronting FHFA. But FHFA’s actions in implementing the Net Worth Sweep “bear no resemblance to actions taken in conservatorships or re-ceiverships overseen by the FDIC.” Ami-cus Br. for Indep. Comm. Bankers of Am. 6 (reflecting the views of former high-ranking officials of the FDIC). Yet today the Court holds that, in the context of HERA — and FIRREA by extension — any action taken by a regulator claiming to be a conservator (short of officially liquidating the company) is immunized from meaningful judicial scrutiny. All this in the context of the Third Amendment’s Net Worth Sweep, which comes perilously close to liquidating Fannie and Freddie by ensur *1128 ing they have no hope of survival past 2018. The Court’s conservator is not your grandfather’s, or even your father’s, conservator. Rather, the Court adopts a dangerous and radical new regime that introduces great uncertainty into the already-volatile market for debt and equity in distressed financial institutions.
Now investors in regulated industries must invest cognizant of the risk that some conservators may abrogate their property rights entirely in a process that circumvents the clear procedures of bankruptcy law, FIRREA, and HERA. Consequently, equity in these corporations will decrease as investors discount their expected value to account for the increased uncertainty— indeed if allegations of regulatory overreach are entirely insulated from judicial review, private capital may even become sparse. Certainly, capital will become more expensive, and potentially prohibitively expensive during times of financial distress, for all regulated financial institutions.
More ominously, the existence of a predictable rule of law has made America’s enviable economic progress possible. See, e.g., Tom Bethell, The Noblest Triumph: Property and Prosperity Through the Ages 3 (1998) (“When property is privatized, and the rule of law is established, in such a way that all including the rulers themselves are subject to the same law, economies will prosper and civilization will blossom.”). Private individual and institutional investors in regulated industries rightly expect the law will protect 'their financial rights — either through an agency interpreting statutory text or a court reviewing agency action thereafter. They are also entitled to expect a conservator will act to conserve and preserve the value of the company in which they have invested, honoring the capital and investment conventions of governing law. A rational investor contemplating the terms of HERA would not conclude Congress had changed these prevailing norms. See generally Yates v. United States, — U.S. -, 135 S.Ct. 1074, 1096, 191 L.Ed.2d 64 (2015) (Kagan, J., dissenting) (noting statutory text may be drafted “to satisfy audiences other than courts”). Today, however, the Court explains this rational investor was wrong. And its bold and incorrect statutory interpretation could dramatically affect investor and public confidence in the fairness and predictability of the government’s participation in conservatorship and insolvency proceedings.
When assessing responsibility for the mortgage mess there is, as economist Tom Sowell notes, plenty of blame to be shared. Who was at fault? “The borrowers? The lenders? The government? The financial markets? The answer is yes. Ail were responsible and many were irresponsible.” Thomas Sowell, The Housing Boom and Bust 28 (2009). But that does not mean more irresponsibility is the solution. Conservation is not a synonym for nationalization. Confiscation may be. But HERA did not authorize either, and FHFA may not do covertly what Congress did not authorize explicitly. What might serve in a banana republic will not do in a constitutional one.
[[Image here]]
FHFA, like the FDIC before it, was given broad powers to enable it to respond in a perilous time in U.S. financial history. But with great power comes great responsibility. Here, those responsibilities and the authority FHFA received to address them were well-defined, and yet FHFA disregarded them. In so doing, FHFA abandoned the protection of the anti-injunction provision, and it should be required to defend against the Institutional and Class Plaintiffs’ claims.

. The Court makes much of the statute's statement that a conservator “may” take action to operate the company in a sound and solvent condition and preserve and conserve its assets while a receiver "shall” liquidate the company. It concludes the statute permits, but does not compel in any judicially enforceable sense, FHFA to preserve and conserve Fannie’s and Freddie’s assets however it sees fit. See Op. 1087-90. I disagree. Rather, read in the context of the larger statute — especially the specifically defined powers of a conservator and receiver set forth in Subsections 4617(b)(2)(D) and (b)(2)(E) — Congress’s decision to use permissive language with respect to a conservator’s duties is best understood as a simple concession to the practical reality that a conservator may not always succeed in rehabilitating its ward. The statute wisely acknowledges that it is “not in the power of any man to command success” and does not convert failure into a legal wrong. See Letter from George Washington to Benedict Arnold (Dec. 5, 1775), in 3 The Writings of George Washington, 192 (Jared Sparks, ed., 1834). Of course, this does not mean the Agency may affirmatively sabotage the Companies’ recovery by confiscating their assets quarterly to ensure they cannot pay off their crippling indebtedness. There is a vast difference between recognizing that flexibility is necessary to permit a conservator to address evolving circumstances and authorizing a conservator to undermine the interests and destroy the assets of its ward without meaningful limit.

. The Director's discretion to appoint FHFA as “ 'conservator or receiver for the purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity’ ” does not suggest slippage between the roles. See FHFA Br. 41 (quoting 12 U.S.C. § 4617(a)(2)). Between the conservator and receiver roles, FHFA surely has the power to accomplish each of the enumerated functions; nonetheless, a conservator can no more “wind[] up” a company than a receiver can "rehabilitate]” it. See 12 U.S.C. § 4617(b)(3)(B) (using "liquidation" and "winding up” as synonyms).

. HERA’s provision for judicial review over a claim promptly filed "within 30 days” of the Director's decision to appoint a conservator or receiver further indicates Congress contemplated continuity of the conservator or receiver role during the period the conserva-torship or receivership endured. 12 U.S.C. § 4617(a)(5). Here, therefore, in transitioning sub silencio from the conservator to receiver role, FHFA has escaped the statute’s contemplated, though admittedly brief, period for judicial review following the transition.

. While the execution of multiple contracts with Treasury “bears no resemblance to the type of conservatorship measures that a private common-law conservator would be .able to undertake,” Op. 1094, that is a distinction in degree, not in kind.

. These legal definitions are reflected in the terms' ordinary meaning. For example, the Oxford English Dictionary defines a "conservator” as "[a]n officer appointed to conserve or manage something; a keeper, administrator, trustee of some organization, interest, right, or resource.” 3 Oxford English Dictionary 766 (2d ed. 1989). In contrast, it defines a "receiver” as "[a]n official appointed by a government ..: to receive ... monies due; a collector.” 13 Oxford English Dictionary 317-18 (2d ed. 1989). Regardless of the terms’ audience, therefore, a "conservator” protects and preserves assets for an entity while a "receiver” operates as a collection agent for creditors.

. The Court also suggests the authority to act " 'in the best interests of the regulated entity or the Agency’ " is consistent with the Director’s mandate to protect the " 'public interest.’ ” Op. 1081 (quoting 12 U.S.C. § 4513(a)( l)(B)(v)). Of course, the FHFA Director is also bound to "carr[y] out [FHFA’s] statutory mission only through activities that are authorized under and consistent with this chapter and the authorizing statutes.” Id. § 4513(a)(l)(B)(iv). Indeed, this text only confirms what should have been evident: the availability of meaningful judicial review cannot bend to exigency, especially since Congress clearly did not believe the 2008 financial crisis required a more far-reaching statutory authorization than prior occasions of financial distress had commanded.

. Similarly, any argument that the Third Amendment was executed to avoid a downward spiral hardly saves FHFA at this juncture. See, e.g., Op. 1092-93. As an initial matter, the contention rests entirely upon an examination of motives. But see id. 1092 (confirming motives are irrelevant to the legal inquiry). Second, even if one were to consider motives, the availability of an in-kind dividend and information recently obtained in this litigation creates, to put it mildly, a dispute of fact regarding the motivations behind FHFA and Treasury’s decision to execute the Third Amendment.